Filed 12/10/13  In re S.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.G., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUITY SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>S.G.,<br><br>        Defendant Appellant. | F067560<br><br>(Super. Ct. No. 516335)<br><br><br>**OPINION** |

## THE COURT\*

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

---

\*        Before Kane, Acting P.J., Poochigian, J. and Detjen, J.

-ooOoo-

S.G. (mother) appeals from an order terminating parental rights (Welf. & Inst. Code, § 366.26)[1] to her son S.G. Mother contends the juvenile court erred in failing to apply the beneficial relationship exception to termination. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 3, 2012, the Stanislaus County Community Services Agency (agency) received a referral that mother wanted to abandon then nine-year-old S.G. because she was not able to care for him. Mother had reportedly made statements that she was having a difficult time raising S.G. and requested that others raise him. She had also threatened S.G. that she would send him to foster care if he did not behave.

On May 8, 2012, a meeting was held at Valley Mountain Regional Center (VMRC), where mother and S.G. were both clients. The goal of the meeting was for VMRC to assist mother in caring for S.G. Mother reported that S.G. would cuss at her, yell at her and call her names, and that these behaviors were too much for her to deal with. Mother said she did not want to abandon her son but wanted him to live in a care home that would help him and his behaviors.

VMRC staff reminded mother about a similar incident that occurred the previous year, in which VMRC had placed S.G. in a care home. S.G. was adjusting well, but after about one month, mother removed him from the home and had him placed in her custody. VMRC staff also reminded mother that numerous intensive programs had been provided to her and S.G., but she had refused to participate in them. In addition, family maintenance services had been offered to mother in November 2011, but she declined services. Mother again declined services at the May 8, 2012 meeting.

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

When asked about S.G.'s father, P.G. (father), mother stated he refused to help raise S.G. but visited the boy approximately two times per month for five hours. Mother indicated that S.G. was not allowed to stay overnight with father because mother did not trust the woman he was dating. Mother did not have any family members who were able or willing to care for S.G.

On May 8, 2012, an emergency social worker contacted father by telephone. Father indicated he would be able to take S.G. as long as he received S.G.'s Social Security check. Father also said he was tired of mother making threats to give up S.G. because she always changed her mind and took back S.G. into her care.

The emergency social worker arranged a meeting with mother and father on May 8, 2012. S.G. was in the residence but was asked to go to his room. The social worker explained that mother had reported she was unable to care for S.G. She asked father if he was willing to have S.G. spend the night at his house. Father replied that S.G. belonged in his mother's home and he did not want S.G. to go to his house. Father said he would stay at mother's home and care for S.G. there. The social worker pointed out that she had received reports of domestic violence between the parents. Father responded that they just argued about "little stupid things."

The emergency social worker noted that the parents bickered and made accusations against each other throughout the meeting. At one point, S.G. came into the room and mother pointed at him and said he was a "jerk" to her and that father never helped her. The parents' argument continued to escalate. Mother began to cuss at father and father told her she needed to take care of the child. The social worker asked the parents to calm down when S.G. began to cry. But the parents continued to argue and father was asked to leave the house. Arrangements were made for S.G. to spend the night with his half-sister's paternal grandfather, E.B. (grandfather), as father was not willing to have S.G. stay with him and mother was unable to care for him.

On May 9, 2012, the parents signed a safety plan, agreeing that S.G. would reside with father and mother would not care for him. They also agreed that mother would not take S.G. out of father's care and visitation would be arranged by the family court.

On May 10, 2012, the emergency social worker received a voicemail from mother stating S.G. had returned to her care and she and father were attempting to work things out so they could be a family.

On May 21, 2012, a family maintenance social worker and a supervisor from the agency met with the parents. The social worker reported that as soon as they entered the apartment, mother began making accusations against father and the parents began to argue. During the visit, the parents continued to fight and it appeared they were unable to interact with each other without it escalating into verbal conflict. Father was asked to leave and it was decided the case would be reassessed.

On May 24, 2012, a VMRC counselor reported she had been working with mother and S.G. for approximately four years. The counselor was concerned with mother's ability to care for S.G. and her unstable home situation. The counselor reported that mother and father had been married and divorced four or five times. They had engaged in intense verbal conflict with one another and S.G. had been a witness to their arguments.

On June 1, 2012, S.G. was placed in protective custody after mother and father signed a waiver.

On June 5, 2012, the agency filed a petition on behalf of S.G., alleging he came under the jurisdiction of the juvenile court pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).

After an uncontested jurisdictional hearing on August 2, 2012, the court found the allegations in the petition, with minor amendments, to be true. The matter proceeded to disposition and the court ordered S.G. removed from his parents' custody and granted the parents reunification services. Over the objection of mother's counsel, the court ordered

4.

mother to undergo a psychological evaluation, noting it was the best way to determine whether services needed to be tailored to address her needs.

The agency filed an interim report on October 23, 2012, reporting that although mother continued to participate in her court-ordered case plan, she had a difficult time understanding the material that was reviewed with her. Dr. Edward Moles completed a psychological evaluation of mother. Dr. Moles concluded there was no course of treatment that could help mother become an adequate parent and, consequently, Dr. Moles recommended mother not regain custody of S.G.

Dr. Moles's psychological evaluation, which was attached to the interim report, reflected that the psychologist evaluated mother on August 30 and September 7, 2012, for approximately three hours. According to information and records Dr. Moles obtained from Central Valley Regional Center and mother's counselor at Sierra Vista, mother was a 37-year-old female who was diagnosed with mild mental retardation and an unspecified chromosomal abnormality. Mother had only attended five of 10 required parenting classes, and she was generally distracted and distracting to others during class. She had also left one class early because she was hungry. It appeared mother was only attending the classes to comply with the agency's requirements and was not focused on learning the material. During counseling sessions, mother tended to blame S.G. for their difficulties and focus on her struggles with the agency rather than on what she needed to do to become a better parent. Mother also referred to S.G. not being potty-trained, even though he was 10 years old, and she indicated he had improved in this area since being in foster care.

In his evaluation, Dr. Moles noted that mother was not stable. She frequently moved, married, and divorced. She currently had no place to live and had been living with friends since July 2012. Mother's current homelessness was apparently a result of her rejecting an available residence because she deemed it too small. Mother expressed that she wanted S.G. back, but, at the same time, she continued to say that, unless he

5.

changed, she would not be able to handle him 24 hours a day, seven days a week. Mother thought S.G. needed to get help. She did not accept that she needed to utilize services to help her deal with S.G. whether or not he changed.

Dr. Moles further reported that mother has a tough time dealing with the stressors in her life. She constantly blamed her circumstances on others, mainly her children's fathers. Mother relied a lot on grandfather, who would drive her around and attend her supervised visits with S.G. According to Dr. Moles, mother had "unusual descriptions of [S.G.] and their relationship." Mother described S.G. as "very controlling" and "implied that he does a very good job of controlling her." Mother also described him as having a hot temper like she did and attributed this to his Indian heritage. Mother felt for their relationship to work, S.G. had to change and she wanted the agency to make this happen. Mother showed no awareness of the effect her behavior had on S.G. or the impact it had on S.G. to grow up in the negative chaotic environments she created.

Dr. Moles expressed concern that mother externalized her issues onto S.G. Mother felt overwhelmed by the responsibility of caring for S.G. and wanted others to fix him. She demonstrated no insight into his behavior or empathy for his situation. Mother only marginally participated in the programs offered to her, and there was little evidence she understood their importance or had applied herself to learning how to parent or become a better parent. Dr. Moles opined that mother's "significant intellectual deficiencies" likely contributed to her problems with S.G. These problems were not going away and S.G. was quickly getting older and needed stability now.

With respect to mother's contacts with S.G., the interim report indicated that mother consistently visited S.G. Mother had requested that the visits be twice a week for one hour each because two hours was too much at one time. During visits, mother had been observed discussing with S.G. the court process and when he was coming home.

On October 24, 2012, a progress review report was filed by S.G.'s court-appointed special advocate (CASA). The CASA reported that S.G. received weekly counseling

6.

services from VMRC.  In his last counseling session, it seemed S.G. liked, and had shown significant progress in his foster placement.  He now took personal responsibility for his grooming, such as brushing his teeth and combing his hair.  He was no longer troubled by the consistent encopresis[2] he once experienced.  And he had not presented any behavioral problems either at his school or in his foster placement.

The CASA noted S.G. was a VMCR client because he had been diagnosed with DiGeorge Syndrome as an infant.  The disorder was caused by a chromosomal defect and could result in poor development of several body systems.  Symptoms of DiGeorge Syndrome can include cardiac problems, failure to thrive, weakened immune responses, delays in physical, speech and learning development, poor muscle tone, and mental health and behavioral problems.  S.G. was assessed as mildly delayed in 2003..

The CASA reported that S.G. had two, one-hour supervised visits each week with mother.  Grandfather and S.G.'s half-sister also attended some of the visits.  On October 9, 2012, the CASA observed a visit for 15 minutes.  S.G. did not have any physical contact with mother when she came into the room and they barely acknowledged each other.  After mother entered the room, mother sat in a chair across from where S.G. was sitting.  Grandfather sat closer to S.G.  S.G. seemed mildly anxious at first, twisting his fingers together and leaning back farther and farther in his chair.  S.G. seemed to grow more comfortable as grandfather drew him into a conversation about his school.  Grandfather expressed interest in S.G.'s calendar and S.G. moved next to grandfather's chair and leaned against his hand as he questioned S.G. about the different activities he had planned for the coming months.  Grandfather spoke to S.G. in a soft and gentle tone.  Most of the interaction that the CASA observed was between S.G. and grandfather.

---

[2]     Encopresis is defined as the "involuntary passage of feces." (Merriam-Webster Online Dict. http://www.merriam-webster.com/medical/encopresis [as of Dec, 9, 2013].)

Mother remained on the periphery of the conversation. Mother occasionally asked S.G. to pick up things, stop making a mess, or pick up the crumbs from the floor.

The CASA remarked that S.G. was a sweet child who seemed somewhat vulnerable because of his strong desire to please. When the CASA first met S.G., the first thing he wanted to do was to show her the picture of him with mother that he kept in the top drawer in his bedroom. S.G. was quite proud of his possessions and took care to show the CASA all of his things. He also spoke several times about the visits he had with mother and seemed to look forward to them with some anticipation.

On December 17, 2012, the CASA filed another report, noting that S.G. had been living with his current foster parents since June 1, 2012. There was also an adopted 13-year-old son living in the home, and the boys had their own rooms. The foster mother recently indicated S.G. and his foster brother had been interacting with each other more frequently and their interactions were quite positive. The foster mother further reported that S.G.'s problem with encopresis had essentially disappeared. He had two isolated incidents, which she believed were due to him playing with his foster brother and failing to get to the bathroom in time.

CASA learned from S.G.'s VMRC counselor that S.G. seemed to be doing very well living with his foster family and that S.G. was appropriate and respectful. The only time the counselor had heard of S.G. being disrespectful and inappropriate was when she was told this by mother. The counselor also reported that, due to S.G. changing schools multiple times in the past, he had been unable to maintain any kind of peer relationships.

The CASA observed another visit between mother and S.G. for 20 minutes, and noted there was no physical contact between them and they hardly acknowledged each other verbally. Most of mother's conversation was directed at the CASA with questions about placement and adoption. The CASA told mother to speak to her social worker and indicated she was not comfortable with mother asking those questions in front of S.G. S.G. set up a board game to play with mother. During the game, S.G. would remind

mother what piece was hers and when it was her turn. He appeared comfortable during this time.

The CASA reported that S.G. told her he wanted to live with mother. Despite this, the CASA concluded that S.G.'s best interests were being met in his current foster placement, where he appeared to be thriving physically, intellectually, and socially. The CASA also noted that, in the future, S.G.'s medical diagnosis would likely present him with significant challenges, which would need to be addressed, understood, and monitored.

The CASA noted that S.G. was a well-behaved and respectful child, and that he had a very strong desire to please others around him. S.G. expressed the belief he was taken from mother because he was "bad." There were also times he would have an upset stomach and worry that his foster parents might get upset with him for being bad. S.G. responded well when there was an issue that needed to be corrected and adults spoke respectfully to him about it. He listened well and complied with what was being requested of him.

On January 3, 2013, the agency filed a status review report recommending that the court terminate family reunification services to both mother and father. The report indicated that on October 31, 2012, mother completed her second psychological evaluation with Dr. Phillip Trompetter, which consisted of a two-hour, face-to-face interview. Based on his evaluation, Dr. Trompetter concluded it was unlikely mother would achieve family reunification within the prescribed time.

In his written evaluation, which was attached to the status review report, Dr. Trompetter described information he had obtained about mother. On multiple occasions, mother had stated she was unable to care for S.G., but then she would become ambivalent and retract her statements. Since the case had come to court, mother had requested that S.G. be placed in her care but reportedly the reasons were for Social Security and to treat her loneliness. Mother had also stated on multiple occasions that it

9.

was hard for her to be nice to S.G. because he would not listen to her and would yell at her. When it was explained to mother that she was the adult and the parent, she would respond by saying her son was mean and she did not know what else to do. During visits, despite numerous redirections to speak to S.G. or play with him, mother continued to speak on her cell phone and not engage with him.

Dr. Trompetter noted that mother's developmental disability was a chronic condition that would not improve. She also displayed several maladaptive personality characteristics which were "usually impervious to remediation attempts." Mother did not accept that she needed reunification services and "tend[ed] to view the problem as emanating from her son or from her son's father." Mother's perspective had remained inflexible despite contrary feedback. Dr. Trompetter opined that mother's "defensive and uninsightful perspective on the cause of the parenting problems" made it highly unlikely she would be able to benefit from reunification services. When mother was not with S.G. she desired to reconcile, but when she was with him, her frustration, intolerance and ineffective parenting skills led to frequent impulses to relinquish him. Dr. Trompetter opined that mother's ambivalence and inconsistency was likely to continue.

The January 3, 2013, status review report reflected that although mother frequently visited S.G., she had been observed making inappropriate comments during visits. On numerous occasions, mother told S.G. he would be going home with her at the next court hearing. She also made promises to him, including promising to take him to Disneyland once he got back home. Mother had been repeatedly asked not to discuss her case plan with S.G. or to tell him he was going home. Mother would respond by saying "he needs to know the truth." Mother did not understand the effects her words might have on him. It continued to be a concern to the agency that mother kept going back and forth on wanting to reunify with S.G.

On January 16, 2013, the juvenile court terminated reunification services to both parents and set a section 366.26 hearing. The court also reduced mother's visits with S.G. to twice per month.

On April 29, 2013, the CASA filed a report noting that S.G. continued to express a desire to live with mother. S.G. visited with mother every two weeks and was very aware of the visits.

Despite S.G.'s expressed desire to live with mother, the CASA believed it was in his best interests to remain with his current foster family and to achieve permanency there. S.G. had thrived in the placement and had attained a great level of comfort with his foster parents and foster brother. He spoke fondly of his foster family and had made both short-term and long-term plans with them.

On May 3, 2013, the agency filed a section 366.26 report, recommending mother's parental rights be terminated and S.G. freed for adoption. S.G.'s foster parents loved S.G. and wanted to adopt him. They were also committed to meeting all his needs. Although S.G. was unsure about being adopted at that time and liked having visits with mother, his foster parents did not want a plan of guardianship but wanted to adopt S.G. Therefore, even though S.G. wanted to continue seeing mother, the agency concluded it was not in his best interests to jeopardize his chance at permanency with a loving family with whom he had been placed since he entered foster care. Accordingly, the agency recommended termination of parental rights.

The contested section 366.26 hearing took place on May 15, 2013. During the hearing, the juvenile court spoke with S.G. in chambers. When asked how he would feel if he could not see his mother or his foster parents anymore, S.G. responded that he would come visit them.

Family reunification social worker Diana Caradonna testified that it was the agency's position that if the current foster parents did not adopt S.G., it would be unlikely the agency could find an alternative adoptive home. Thus, S.G. was specifically, rather

than generally, adoptable. The foster parents reportedly wanted to adopt S.G. and did not want to proceed with a legal guardianship.

The juvenile court accepted mother's offer of proof that she did not believe it was in S.G.'s best interest to be adopted. Mother believed it would be upsetting to S.G. and a real setback for him. Mother loved S.G. very much and did not want him to be adopted but wanted the court to honor his wishes to come home with her. Alternatively, mother asked the court to pursue an alternative to adoption.

At the conclusion of the section 366.26 hearing, the juvenile court found S.G. was specifically adoptable and terminated parental rights, finding that the parents had not met their burden to prove termination would be detrimental to S.G. The court explained its ruling, in part, as follows:

> "But the obligation or the burden on mother in this particular instance is to be able to prove that the detriment that [S.G.] would have as a result of termination of parental rights would be so extreme that that detriment that he suffers would outweigh the benefit to having permanency in having a stable and permanent home. And I just don't see where mother has really been able to prove that burden. She's come up with a lot of speculative arguments, but none of those we really know. [¶] … [¶] But in this particular case, there is no evidence that [S.G.] is not doing well in the foster home. He seems to be doing well. He seems to be thriving.

> "And his CASA, who has been able to form an unbiased opinion and been able to spend a significant amount of time with [S.G.], has indicated that she supports the recommendation, and she thinks he is doing very well in the home. And the Court certainly has to give the CASA's statements weight, because that is one of the reasons for the CASA, somebody who is speaking on behalf of the child.

> "And, unfortunately, a guardianship is not an option because the prospective adoptive parents, although they don't have the exact status at this point, are not interested in guardianship. He's doing well and thriving in that placement. And so if an adoption is not determined to be the best permanent plan, then that means a great likelihood that [S.G.] would have to be placed elsewhere, and that's certainly not in his best interest to be moved again. He is in a home where he's thriving. He's made improvements. He might not like always having to follow his chores or to

brush his teeth, but there's no indication that he's not doing well in that home.  [¶]  So the Court will adopt and approve the [agency's] findings and recommendations ….".

## *DISCUSSION*

Once the juvenile court has terminated reunification services, its focus shifts to the child's needs for permanency and stability.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) If, as here, the child is likely to be adopted, adoption is the norm.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).)  The statutory presumption is that termination is in the child's best interests and not detrimental.  (§ 366.26, subd. (b); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342.)

The juvenile court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances in section 366.26 provides a compelling reason for finding that termination of parental rights would be detrimental to the child.  (*Celine R., supra,* 31 Cal.4th at p. 53.)  Further, it is an opposing party's burden to show that termination would be detrimental under one of the statutory exceptions.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

To avoid termination of parental rights under the beneficial relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  It is the parent's burden to prove the exception applies.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The Court of Appeal in *Autumn H.*, *supra*, 27 Cal.App.4th 567, defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Id.* at p. 575.)  "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural

13.

parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 (*I.W.*).) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F., supra,* at p. 555.)

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*); *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].)

Our conclusion in this case would be the same under any of these tests because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to

14.

analyzing the sufficiency of the evidence for the ruling.... Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' ... "'" (*Ibid.*) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial relationship cannot succeed unless the undisputed facts establish the existence of a beneficial parental relationship, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." ( *I.W.*, *supra*, 180 Cal.App.4th at p. 1529; *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

It is undisputed mother maintained regular visitation with S.G. However, she failed to meet her burden of proving S.G. would benefit from continuing his relationship with her. Mother did not show the relationship promoted S.G.'s well-being to such a degree that it outweighed the well-being he would gain in a permanent home with the new adoptive parents. Although S.G. reportedly expressed a desire to visit and live with mother, there was evidence from which the court could reasonably conclude his desire stemmed less from the existence of a positive parent/child relationship, and more from his strong desire to please people and his troubling belief, to which mother contributed, that his "bad" behavior was the cause of the dependency proceedings. There was also evidence that, despite S.G.'s expressed desire to visit mother, the actual quality of their visits was very poor. There was minimal interaction between mother and S.G., and when they did interact, mother would engage in inappropriate conversation about the court proceedings and tell S.G. he was coming home.

Contrary to mother's suggestion, the factors set forth in *In re Angel B.* (2002) 97 Cal.App.4th 454, do not establish the existence of a substantial, positive attachment between mother and S.G. such that he would be greatly harmed by the severing of the parent/child relationship. In that case, the court held the factors to be considered when looking for whether a parent/child relationship is important and beneficial are: "(1) the

age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*Id.* at p. 467, fn. omitted; see also *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

As to the first two factors, it is true S.G. is not a very young child and he has spent the majority of his life in mother's custody. However, regarding the third factor, there is no evidence mother demonstrated any affection towards S.G. during visits. Instead, the reports before the court indicated mother and S.G. barely acknowledged each other and there was no physical contact between them. When mother did speak to S.G., it was mainly to discuss inappropriate topics. There was also evidence mother would talk on her cell phone during visits despite being instructed multiple times to talk to S.G. or engage him in play. On the other hand, S.G. was thriving in his placement with the prospective adoptive parents who were able to meet all his needs. As to the fourth factor, there was no evidence S.G. had any needs that can be met only by mother. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) Indeed, the evidence indicates that mother was unable to meet S.G.'s needs as he reportedly suffered from chronic encopresis which all but disappeared after he was placed with his prospective adoptive parents.

On this record, the juvenile court could reasonably find S.G.'s need for permanence outweighed the benefits he would derive from a continued relationship with mother. It also could find that severing S.G.'s relationship with mother would not deprive him of a substantial, positive emotional attachment that would greatly harm him. Accordingly, the court did not err by failing to apply the beneficial relationship exception to the termination of mother's parental rights.

### *DISPOSITION*

The judgment is affirmed.